# In the United States Court of Federal Claims

Nos. 25-1654C; 25-1696C; 25-1740C (consolidated)
(Filed: February 20, 2026)
(Re-issued: March 3, 2026)[1]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

FIRE CREEK COMPANY,

       *Plaintiff*,

v.

THE UNITED STATES,

       *Defendant.*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ALEUT MANAGEMENT SERVICES, LLC,

       *Plaintiff*,

v.

THE UNITED STATES,

       *Defendant.*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>OPINION</u>

Bruggink, Judge.

Pending in these consolidated bid protests are plaintiffs' and defendant's motions for judgment on the administrative record. The matter is fully briefed, and oral argument was heard on February 17, 2026. For the reasons set out below, we grant defendant's motion and deny plaintiffs'

---

[1] This opinion was originally issued under seal to afford the parties an opportunity to propose redactions of protected information. Redactions are indicated by brackets.

motions.

## BACKGROUND[2]

On June 15, 2023, defendant, acting through the General Services Administration ("GSA" or the "agency") issued solicitation no. 47QRCA23R0002. This request for proposals (the "Solicitation") seeks offerors under the One Acquisition Solution for Integrated Services Plus ("OASIS+) program, which permits awardees to bid on task orders for various services.

OASIS+ consists of six families of Indefinite Delivery Indefinite Quantity "Master Contracts" with unique requirements. The six families include: (1) 100% small business set-aside; (2) 100% 8(a) small business set-aside; (3) 100% HUBZone small business set-aside; (4) 100% SDVOSB set-aside; (5) 100% WOSB set-aside; and (6) unrestricted. Plaintiffs Aleut Management Services, L.L.C. ("Aleut") and Fire Creek Company ("Fire Creek") each submitted proposals for 8(a) small business set-aside awards.

Each OASIS+ master contract is organized by seven industry disciplines referred to as "domains" in the solicitation. These domains are (1) management; (2) engineering; (3) research; (4) intelligence; (5) environmental services; (6) facilities; and (7) logistics. When submitting proposals, offerors submit proposals for each domain individually. Both plaintiffs applied to more than one domain.

Awards were not necessarily given to the lowest bidder but to offerors providing the "best value." Administrative Record ("AR") Tab 13a, 2157. Section M.3 of the solicitation explains the decision criterion: "proposals submitted in response to this solicitation will be awarded credits in accordance with unique Qualifications Matrices." *Id.* Each domain has a specific Qualifications Matrix and corresponding qualifying threshold. To receive a "domain award, the offer must meet or exceed the Domain-specific qualification threshold at Section M.7 through submission requirements in Section L." *Id.* GSA intended to make an award to each qualifying offeror and was not limited to a specific number of contract awards.

Section M 3.1 defines a qualifying offeror based upon five criteria. Two are relevant here. First, a qualifying offeror must submit a proposal conforming to the requirements of the solicitation, and second, must meet "all technical requirements referenced in Section M.6." Tab 13a, 2159

---

[2] These facts are drawn from the Administrative Record.

Section M.6 is entitled "Technical and Past Performance Evaluation." *Id.* at 2160. It provides five methods for offerors to earn points for past performance. These are: Qualifying Project Experience (L.5.2); Federal Prime Contractor Experience (L.5.3); Systems, Rates, and Clearances (L.5.4); Certifications (L.5.5); and Past Performance (L.5.6). Both plaintiffs opted to use Section L.5.2's qualifying project ("QP") method. Section M.6.2 requires offerors using QPs to "ensure all the requested proposal submission information is current, accurate, and complete in accordance with Section L.5.2." *Id.* at 2161. QPs are "scored in accordance with Section M.7." *Id.*

Section M.7 explains the "OASIS+ Qualifications Matrix" or scoring table for each domain. AR Tab 13a, 2165. The scoring table set the qualifying point threshold for all small business and socioeconomic set-asides at thirty-six out of the available fifty credits. The specific domain matrices are laid out in solicitation attachment J.P-1—the OASIS+ Domain Qualifications Matrices and Scorecards. These matrices give credit for QPs based upon: Relevance (L.5.2.3.1); Scale (L.5.2.3.2); Integrated Experience (L.5.3.3); Specialized Functional Experience (L.5.2.3.5); and Management and Staffing (L.5.2.3.4).

To take credit for a QP, offerors have to comply with section L.5.2.2 which states that

> The Offeror may submit a maximum of five distinct QPs for each Domain. QPs may be either Relevant or Non-Relevant QPs as defined in Section L.5.2.1.
>
> *For award under the OASIS+ 8(a) IDIQ, a minimum of two QPs must be from an SBA-certified 8(a) small business concern for each proposed domain.* To satisfy this requirement, the two submitted QPs can be from an 8(a) member of the offering joint venture, the offering 8(a) joint venture, or a proposed 8(a) subcontractor, as described in Section L.5.1.3.1. The QPs may also include projects that the 8(a) team member performed as an other than small business or non-8(a) concern.

*Id.* at 2130 (emphasis added).

This dispute concerns how to read the highlighted language. Defendant insists that bidders should have understood that, regarding the two QP minimum language, the entity having performed the QP must have been an 8(a) certified business concern at the time of the offer. It contends that this

3

is the plain and only reasonable reading of the section. Plaintiff, relying on language at Section L.5.1.4 ("L.5.1.4), set out below, takes the position that the offeror's status as an 8(a) is imputed onto the entity having performed the work. Thus, it is unnecessary that the originating entity have been an 8(a) at any time.

Plaintiff relies on Section L.5.1.4, on Meaningful Relationship Commitment Letters ("MRCLs") which provides that

> Within a corporate structure, an Offeror (to include a member of a joint venture) may utilize resources from a Parent Company, Affiliate, Division, and/or Subsidiary. Subject to the conditions of this Solicitation, GSA will allow an Offeror to take credit for any scored evaluation element, including QPs [Federal Experience Projects], past performance, system(s), certification(s), and/or clearances from a Parent Company, Affiliate, Division, and/or Subsidiary so long as there is a meaningful relationship to the Offeror and commitment letters are provided to the Government.

AR Tab 13a, 2118. Plaintiffs contend that section L.5.2.2 must be read in light of this provision. It permits, they contend, small businesses like themselves to use QPs originating from affiliated non-small businesses regardless of whether those other businesses were 8(a)s at the time of the offer. Defendant responds that allowing credit for QPs for scoring experience/past performance purposes has nothing to do with the initial question of whether the offeror submitted the requisite two QPs from an SBA-certified 8(a).

Both Fire Creek and Aleut sought to use MRCLs to satisfy section L.5.2.2's requirements. Aleut is a subsidiary of Aleut Federal and has several sister companies under Aleut Federal. To demonstrate its experience, it submitted five QPs in the management and engineering domains and leveraged two of its sister companies in doing so. [                    ] and [                    ] performed the work in the ten QPs Aleut submitted. [  ] had been an SBA-certified 8(a) business until 2022 but was not at the time of offer. [  ] was 8(a) certified at the time of the bid proposal and will remain so until October 25, 2026.

Fire Creek submitted QPs in five different domains, though only its submission in the facilities domain is at issue today. With respect to that offer, Fire Creek submitted five QPs from an affiliate, [                    ].

4

That company was an SBA-certified 8(a) business until 2020, but was not so certified at the time of the offer.

Both plaintiffs received an Unsuccessful Offeror Notification ("UON") on June 18, 2025. Each notification used identical language: the companies "did not submit a minimum of two Qualifying Projects from a SBA-certified 8(a)" business. AR 39a, 7202. At that point in the evaluation process, the rejection was based on the fact that the QPs were performed by entities which only had an MCRL connection to the plaintiffs.

After receiving its UON, Fire Creek responded with a letter to GSA asserting error while Aleut submitted a pre-filing notice of a bid protest here. On July 15, 2025, the Contracting Officer reversed position, finding an ambiguity in the solicitation. Initially, the agency had read section L.5.2.2 as permitting only those types of QPs explicitly listed in section L.5.2.2—"an 8(a) member of the offering joint venture, the offering 8(a) joint venture, or a proposed 8(a) subcontractor." AR Tab 13a, 2131. At that point, it rejected QPs submitted through an MRCL. The CO subsequently reconsidered the agency's interpretation, however, and decided to allow reliance on MRCL connections. The parties thus received a Corrective Action Notice stating that the agency intended "to take corrective action in connection with its prior determination regarding your reliance upon Meaningful Relationship Commitment Letters (MRCLs)." AR Tab 39b, 7204.

Fire Creek thereafter received an Apparent Awardee Notification in four domains which it had initially been deemed unresponsive. GSA still deemed Fire Creek unresponsive with respect to the Facilities domain, however, because its MRCL affiliate was not an 8(a) certified business at the time of the offer. Aleut received a UON on September 17, 2025, rejecting the company's proposal. GSA concluded that Aleut had not "submitted two Qualifying Projects from a SBA-certified 8(a)" business. AR Tab 34.2, 6900. Aleut filed suit here on October 15, 2025. Fire Creek filed suit here on October 3, 2025. The cases were later consolidated.

## DISCUSSION

Aleut and Fire Creek argue that GSA's rejection of their offers was inconsistent with a plain reading of the solicitation, or alternatively, that their interpretation was reasonable, that the solicitation was therefore latently ambiguous, and could not be grounds for rejecting the plaintiffs' proposals. Defendant counters that the plain language of the solicitation requires all QPs to be from current 8(a) entities. It also argues that the plaintiffs' interpretation, even if credited, merely makes the solicitation patently

ambiguous. This would place on bidders the obligation to enquire as to the agency's intent prior to bidding.

Sections L.5.1.4 and L.5.2.2 must be read, insofar as possible, in a manner consistent with each other and giving reasonable meaning to both provisions. *See Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004). We do not think it unfair to plaintiffs to construct a provision which melds both sections in the way that they propose. We begin with section L.5.2.2 because it more comprehensively sets out the structure of an offer. Eliminating any extraneous language, and then rewriting the provision by adding the connecting word "or" along with only the relevant language from 5.1.4 on which plaintiffs rely we create the following amalgam:

> The Offeror may submit a maximum of five distinct QPs for each domain . . . .
>
> For an award under the OASIS+ 8(a) IDIQ, a minimum of two QPs must be from an SBA-certified 8(a) small business concern for each proposed domain. To satisfy this requirement, the two submitted QPs can be from
>
> 1) an 8(a) member of the offering joint venture,
> 2) the offering 8(a) joint venture, []
> 3) a proposed 8(a) subcontractor,
> 4) *or, subject to the conditions of this Solicitation, GSA will allow an Offeror to take credit for any scored evaluation element, including QPs from an Affiliate, so long as MCRLs are provided to the Government.*

Plaintiffs furnished MCRLs from affiliates, so they argue that the two QP minimum is met by what they view as the fourth option. Even though the affiliate doing the QP work was not an 8(a) SBA-certified concern at the time of the offer, the offering entities themselves were. In other words, the 8(a) status of the offeror is imputed back to the affiliates according to plaintiffs. We read the solicitation differently.

We think the government has the only plausible interpretation. The first sentence of section L.5.2.2 tells offerors that they may submit up to five QPs. At that point in the reading, the source of the proposal is obviously the named offeror. The follow-on language of limitation—"a minimum of two QPs must be <u>from</u> an SBA-certified small business concern"— is plainly concerned with who performed the two QPs. AR Tab 13a, 2131 (emphasis

added). Section L.5.2.2 thus contemplates two roles: offeror and QP performer. That section permits the offeror to submit a QP it performed but it also permits QPs not performed by the offeror. Section L.5.2.2 makes this clear by permitting QPs from "an 8(a) member of the offering joint venture" and "a proposed 8(a) subcontractor." *Id.* In both of those examples, the QP is not performed by the offeror. Therefore, the words "a minimum of two QPs must be <u>from</u> an SBA-certified small business concern" *id.*, requires offerors to submit QPs from 8(a) performers. It would be inappropriate to defang that limitation through the assumption that all QPs are deemed to come "from" the offeror merely because the offeror is sponsoring the overall proposal and therefore the QP work itself can be attributed to an 8(a) entity.

The specific concern of the limitation is thus not, "who is offering the *proposal*?" Rather, it is "did an 8(a) do the QP work offered to meet the two QPs from an 8(a) entity requirement?" The structure of the paragraph, which begins with an assumption that the entire package is offered by an 8(a) entity and then limits the source of qualifying QPs only to 8(a)s, plainly suggests that the QP itself originates from an SBA-certified small business concern that actually did the work. For that reason, plaintiffs' argument that the word "from" more properly is associated with the entities offering the proposals makes little sense.

Moreover, as defendant points out, the common thread in all three examples of a qualifying source of a QP "from" an SBA-certified 8(a) small business concern is the term "8(a)": an *8(a)* member of the offering joint venture, the offering *8(a)* joint venture, or a proposed *8(a)* subcontractor. While the list is not structured to be exhaustive, the fact that the examples are all 8(a)s suggests that the intent is to credit only QPs from 8(a) businesses.

Nor does this interpretation read out section L.5.1.4: it still has real significance. That significance, as defendant points out, involves *scoring* the merits of the proposals on experience/past performance once they are deemed eligible for review. Thus, once an offeror meets the threshold entry requirement of submitting at least two QPs from an 8(a), all five of the potential QPs are then evaluated under the detailed scoring matrix set out in JP-1. The only scoring contemplated in that matrix is at the subsection level. No minimal points are awarded simply for being a QP. For instance, the fifty potential points for the Technical & Engineering Domain are scattered across ten subsection categories and include four categories specific to QPs: twenty points for QP Relevance under L.5.2.3.1; six points for QP Scale under L.5.2.3.2; five points for QP Integrated Experience under L.5.2.3.4; and seven points for QP Management and Staffing under L.5.2.3.4. *See* AR Tab

5.1, 469. Offerors thus can "take credit" within the meaning of L.5.1.4 for QPs from affiliates.[3]

Plaintiffs' fallback argument is that their interpretation was reasonable, and, if both parties in a bid protest assert reasonable interpretations of a solicitation, the terms are ambiguous. *See Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993) (A solicitation is ambiguous if it is "susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language".). In that event, unless the ambiguity is so patent that it should have been obvious to the bidders, plaintiffs receive the benefit of the doubt.

Plaintiffs highlight the fact that sixteen other offerors submitted QPs crediting MRCLs from companies which are not currently 8(a) certified. Stipulation of Fact at 5, *Fire Creek Company v. United States*, No. 25-cv-01654 (January 14, 2026). We note that apparently thirty-one offerors interpreted the solicitation consistent with the agency's view. Nevertheless, even if we conclude that GSA's view is merely reasonable and not clearly the correct one, then we are left with two competing reasonable interpretations. In that event, we find that the plaintiffs had to be on notice of the likelihood of a conflicting interpretation.[4] For example, if plaintiffs thought they could earn credits for section L.5.2.2 using section L.5.1.4, the absence of L.5.2.2 in the scoring matrices would be an obvious

---

[3] Defendant's interpretation of L.5.2.2 is fortified by the Government Accountability Office ("GAO") decision in *Mission SOLAIYA JV, LLC*, 2024 WL 478849. In that case, GAO considered a protest in which the offeror attempted to satisfy a requirement through an MRCL, as here. *Id.* at *4. The offeror in that case argued that MRCLs could be used to satisfy threshold requirements. The GAO rejected that argument stating that the threshold requirement "was not listed on the qualification matrix and scorecard, and no points were awarded for satisfying the requirement." *Id.*

[4] Patent ambiguities place on offerors a duty to inquire prior to submitting a proposal. *See H & H Moving, Inc. v. United States*, 499 F.2d 660 (1974) (holding a "contractor ha[s] a duty to inquire about [a patent ambiguity] at the start."); *see also Stratos*, 213 F.3d at 1381 (such ambiguities should "prompt a contractor to rectify the inconsistency."). *Accord Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action.").

inconsistency. Thus, the plaintiffs were under an obligation to inquire of the agency as to its intent.

CONCLUSION

Because plaintiffs' interpretation of sections L.5.2.2 and L.5.1.4 is unreasonable and would render the solicitation patently ambiguous, they cannot prevail on the merits. Thus, we need not consider the other factors necessary for an injunction. Accordingly, the following is ordered:

1. Plaintiffs' motions for Judgment on the Administrative Record (ECF Nos. 32, 34) are denied.

2. Defendant's cross-motion for Judgment on the Administrative Record (ECF No. 33) is granted.

3. The Clerk of Court is directed to enter judgment for defendant. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge